IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **DONNA M. NELSON**, | : | Case No. 1:13-CV-01423 |
| Plaintiff, | : | |
| vs. | : | |
| COMMISSIONER OF SOCIAL SECURITY | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

**I. INTRODUCTION.**

Pursuant to 72.2(b)(1) of the UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULES, this case was automatically referred to the undersigned Magistrate Judge for a report and recommendation.  Plaintiff seeks judicial review of Defendant's final determination denying his claim for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act).  Pending are the Briefs of the parties and Plaintiff's Reply (Docket Nos. 16, 17 & 18).  For the reasons set forth below, the Magistrate recommends that the Court remand this case to the Commissioner pursuant to sentence four of 42 U. S. C. § 405(g).

## II.  PROCEDURAL BACKGROUND.

On January 10, 2011, Plaintiff completed applications for Title II and Title XVI benefits alleging that she became unable to work because of her disabling condition on April 30, 2008[1] (Docket No. 11, pp. 202-208; 209-214 of 738).  On April 25, 2012, Plaintiff, represented by counsel, and Vocational Expert (VE) Nancy Borgeson, appeared before Administrative Law Judge (ALJ) George D. Roscoe (Docket No. 11, pp. 16; 31 of 738).  On May 14, 2012, the ALJ rendered an unfavorable decision, finding that Plaintiff was not under a disability from April 30, 2008, through May 14, 2012, the date of the decision (Docket No. 11, pp. 16-24 of 764).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on May 1, 2013 (Docket No. 11, pp. 6-8 of 738).

Plaintiff timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).  Defendant filed an Answer and Transcript of the proceedings (Docket Nos. 10 & 11).

## III.  PLAINTIFF'S TESTIMONY.

On April 25, 2012, Plaintiff was 47 years of age, weighed 260 pounds and was 5'5" tall. Plaintiff, a divorcée, shared an apartment with her two minor children.  Their sources of income were from Job and Family Services and the Supplemental Nutrition Assistance Program (Docket No. 11, pp. 34-35; 42; 43 of 738).

After obtaining her general equivalency degree, Plaintiff attended Lakeland Community

---

[1]

Plaintiff previously filed Title II and Title XVI applications on March 8, 2010, alleging that she became unable to work because of his disabling condition on July 4, 2008.  The applications were denied on September 8, 2010 (Docket No. 11, pp. 191-192; 198-201 of 738).  Pursuant to the doctrine of *res judicata,* the ALJ dismissed Plaintiff's request for benefits from April 20, 2008, the alleged onset date through September 8, 2010, the date of her previous denial.  The ALJ addressed only Plaintiff's request for hearing beginning with the unadjudicated period, which commenced on September 9, 2010 (Docket No. 11, p. 16 of 738).

College and pursued courses of study in business and appliance repair.  Impairments to her memory caused her to "flunk out" of school.  Plaintiff was literate and she could perform some simple mathematics.  Although her case manager transported her to the hearing, Plaintiff had a driver's license and she was able to drive (Docket No. 11, pp. 35- 36; 45 of 738).

During the past fifteen years, Plaintiff was employed in the retail and food preparation industries, specifically, Arby's®, Big Lots, Mark's and Drug Mart.  Her primary responsibilities included unloading trucks and stocking shelves.  She was expected to lift up to seventy-five pounds without assistance.  At Mark's, Plaintiff stood all day and took pieces off a truck one at a time (Docket No. 11, pp. 36; 37 of 738).

Plaintiff suffered two aneurysms[2] between her eyes that ruptured.  She underwent two surgeries during which coiling was used to prevent further rupturing and bleeding.  Plaintiff had not had any recurrent hemorrhages since her surgeries were completed but she had headaches once or twice monthly.  Plaintiff, however,  was chronically depressed and she had anxiety attacks a few times weekly, during which she was physically ill, withdrawn and unable to concentrate.  Plaintiff treated with her primary care physician (PCP) to regulate her blood pressure and blood sugar levels with drug therapy.  She treated with a psychiatrist to regulate her mental health issues and she saw a counselor for purposes of adjusting her living skills.  Plaintiff did not identify any side effects from the medications taken for any of her symptoms.  Notably, her symptoms were exacerbated by stress (Docket No. 11, pp. 37; 38; 39; 40; 46-47 of 738).

---

[2]
An aneurysm is a circumscribed dilation of an artery or a cardiac chamber, a direct communication with the lumen, usually due to an acquired or congenital weakness of the wall of the artery or chamber. STEDMAN'S MEDICAL DICTIONARY 21850 (27th ed. 2000).

3

Plaintiff claimed that she had very little physical activity; mainly, she just "sat and rocked." As a consequence, she had gained 20 pounds during the past six months.  Uncertain of how long she could stand, Plaintiff claimed that she could bend, stoop or squat "to an extent," that she could manipulate using her fingers and that she could lift a gallon of milk with difficulty.  Plaintiff had trouble breathing if she walked "long" distances (Docket No. 11, pp. 35; 41; 42; 43 of 738).

Plaintiff explained that memory loss was a big issue particularly when she had difficulty remembering to shower, wash her hair or get dressed.  Plaintiff had difficulty dealing with crowds and particularly strangers and her ability to concentrate was similarly compromised (Docket No. 11, pp. 42; 43 of 738).

Plaintiff described her sleep pattern as "up and down."  During the school year, she got her son up at five and went back to bed.  She got her daughter up at seven and then laid down.  She would nap during the day, perform the traditional "light housework" when it was absolutely necessary and prepare dinner.  Because the laundry room was located in the basement, Plaintiff did the laundry about once a week or week and a half or when her children complained that there were no clean clothes.  Plaintiff shopped once or twice monthly and she had no hobbies or regular activities (Docket No. 11, pp. 43; 44; 45 of 738).

## IV.  THE VE'S TESTIMONY.

The VE, a vocational rehabilitation specialist, appeared for the purpose of giving impartial opinion testimony.  Plaintiff's counsel did not object to her professional qualifications or her ability to serve as an expert.  The VE averred that she was familiar with the Social Security's definitions and that her testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a universal classification of occupational definitions and how the occupations are performed, and its

4

companion publication, SELECTED CHARACTERISTICS OF OCCUPATIONS (SCO), a Department of Labor publication that lists physical demands, working conditions and training time data. The VE acknowledged her duty to advise of any conflict and the basis of her opinion (Docket No. 11, pp. 47; 48 of 738; www.occupationalinfo.org).

Initially, the VE categorized Plaintiff's past relevant work or work that she performed during the past fifteen years on a full time basis, by (1) job title; (2) job classification in DOT; (3) exertional level; (4) skill level; and (5) the amount of lapsed time required by a typical worker to learn the techniques and develop the facility needed for average performance or the specific vocational preparation level (SVP):

| (1) JOB (2) DOT | (3) PHYSICAL EXERTIONAL LEVEL | (4) SKILL LEVEL | (5) SVP |
|---|---|---|---|
| STOCKER 299.367-014 | **Heavy work** involves lifting no more than 100 pounds at a time with frequent lifting or carry of objects weighing up to 50 pounds. 20 C. F. R. §§ 404.1567(d); 416.967(d). | **Semi-skilled wo**rk is work that needs some skills but does not require doing the more complex work duties. 20 C. F. R. §§ 404.1568(b); 416.967(b). | **4**–over three months up to and including six months. Www.onetonline.org/help/online/svp |

(Docket No. 11, pp. 48-49 of 764; www.onetonline.org;).

In the *first* hypothetical question, the ALJ asked the VE to assume:

An individual who is 47 years of age; has a 12-year education plus a couple of years in college; can read and write in English and perform simple mathematics; has primary work experience as a stocker in a retail establishment, and no other vocationally relevant work; this person is limited exertionally to light work as defined at 20 C. F. R.§§ 404.1567(b); 416.967(b); she has additional non-exertional limitations, specifically, no climbing of ladders, ropes and scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; with respect to mental limitations, she can perform simple routine tasks without strict production quotas; with minimal changes in work duties and superficial interpersonal interactions; could such individual perform her past work?

The VE responded that within the following exertional, skill and SVP classifications, Plaintiff could perform the following jobs:

| JOB DOT | PHYSICAL EXERTIONAL LEVEL | SKILL LEVEL | SVP |
|---|---|---|---|
| Mail clerk (not in a post office) 209.687-026 | **LIGHT WORK** is work which involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects that weigh no more than 10 pounds. Light work generally requires a good deal of standing and walking.  20 C. F. R.  §§ 404.1567(b); 416.967(b). | **UNSKILLED WORK** is work which requires little or no judgment to do simple duties that can be learned on the job in a relatively short period of time.  20 C. F. R. §§ 404.1568(a); 416.968(a). | **2**–the level of time required for a typical worker is anything beyond a short demonstration up to and including one month. . Www.onetonline.org/help/online/svp |
| Folder (laundry establishment or dry cleaner) 583.685-042 | LIGHT WORK | UNSKILLED | 2 |
| Bagger (retail establishment) 920.687-018 | LIGHT WORK | UNSKILLED | 1–short demonstration only Www.onetonline.org/help/online/svp |

In Northeast Ohio, the State of Ohio and nationally, the jobs of mail clerk, folder and bagger are available as follows:

| Job | Northeast Ohio | State of Ohio | Nationally |
|---|---|---|---|
| Mail Clerk | 1,400 | 7,000 | 139,000 |
| Folder | 3,000 | 20,000 | 392,000 |
| Bagger | 6,000 | 48,000 | 795,000 |

The VE averred that these findings were consistent with the information found in DOT and SCO (Docket No. 11, pp. 50; 51 of 793).

In the *second* hypothetical question, the ALJ asked the VE to assume:

The same individual, same age, education and work background, same residual functional capacity but with the additional limitation that due to symptoms from medically determinable impairments such individual would be off task at least 20% of the time.  Could this individual perform past work or other jobs existing in significant numbers in the economy?

The VE responded that such person could perform the job tasks, but would not be able to sustain those jobs or any full-time job (Docket No. 11, p. 51 of 738).

## V.  MEDICAL EVIDENCE.

6

Plaintiff is responsible for providing medical evidence showing that she has an impairment and the severity of that impairment.  20 C. F. R. §§ 404.1512(c), 416.912(c) (Thomson Reuters 2013).  The medical evidence generally comes from sources who have treated or evaluated the claimant for his or her impairment.  20 C. F. R. §§ 404.1512 (c), 416.912(b) (Thomson Reuters 2013).  The following is a summary of the medical evidence presented by Plaintiff.

1.      CLEVELAND CLINIC FOUNDATION.

After a successful surgery on the partially thrombosed aneurysm, Plaintiff presented to Dr. David J. Fiorella, M.D., a neurosurgeon, for a follow-up visit on April 22, 2005.  The neurologic examination was intact and he planned to repeat the duplex of the lower extremities for propagation of the deep vein thrombois[3] (DVT) in approximately three months (Docket No. 11, pp. 373-374 of 738; www.healthgrades.com/physician/dr-david-fiorella-29src)

During follow-up care on the post-coil protocol on July 8, 2005, Dr. Fiorella noted that Plaintiff was doing well but her blood pressure was "quite elevated" and she continued to experience lower extremity DVT which was untreated.  He referred Plaintiff to her PCP for treatment of these abnormal conditions (Docket No. 11, pp. 371-372; 439-440 of 738).

Plaintiff had returned to work and was functioning relatively well.  On March 1, 2006, Plaintiff presented with complaints of frequent headaches, right neck and arm pain and occasional dizziness.  The magnetic resonance imaging (MRI) of her brain showed no restricted diffusion to suggest the presence of an acute infarct.  The aneurysm was stable but there was evidence of a small lesion.  Surgical intervention was not warranted at that time (Docket No. 11, pp. 369; 433; 435-438 of 738).

---

[3]

Clotting within a blood vessel which may cause infarction of tissues supplied by the vessel.  STEDMAN'S MEDICAL DICTIONARY 409110 (27th ed. 2000).

Dr. Peter A. Rasmussen, M. D., a board-certified neurosurgeon, successfully performed a "right pterional craniotomy and clipping of complex ACOM aneurysm with operating microscope and lumbar subarachnoid drain" on April 6, 2008 (Docket No. 11, pp. 375-377 of 738; www.healthgrades.com/physician/dr-peter-alan-rasmussen-3jfxk).

Dr. Marc Penn, M. D., concluded from the results from the electrocardiogram administered on April 6, 2008, that Plaintiff had sinus bradycardia[4] with sinus arrhythmia.  Otherwise the results were indicative of no abnormality (Docket No. 11, pp. 448-450 of 738).

Dr. Thomas J. Masaryk, M.D., a neuroradiologist, performed an "intra-aortic digital subtraction angiography through the left common femoral artery."  He reported that no complications were identified or resulted during or after the procedure (Docket No. 11, pp. 430-431 of 738; www.healthgrades.com/physician/dr-thomas-masaryk-2ltq5).

The results from the computed tomographic scan (CT scan) of Plaintiff's brain administered on April 7, 2008, when compared to the study conducted on the previous day, showed a new acute infarct involving the right caudate nucleus and anterior internal capsule in territory of a recurrent artery after decompression (Docket No. 11, pp. 421-430 of 738).

The echocardiogram administered on April 7, 2008, to rule out a thrombus[5], showed no significant valvular abnormalities and no pericardial effusion.  The left and right ventricles were normal in size and systolic function and the left ventricular ejection fraction of 60%, an amount that apparently was within normal limits as the examiner did not diagnose Plaintiff with ventricle heart

---

[4]

Slowness of the heartbeat. STEDMAN'S MEDICAL DICTIONARY 54300 (27th ed. 2000).

[5]

A clot in the cardiovascular systems formed during life from constituents of blood.  STEDMAN'S MEDICAL DICTIONARY 409190 (27th ed. 2000).

8

failure (Docket No. 10, pp. 445-446 of 738).

On April 10 and April 17, 2008, Plaintiff underwent a Doppler examination to ascertain the presence of vasospasm[6] status post aneurysm clipping.  The results showed that both the right and left sides were positive for enlarged lymph node and negative for DVT (Docket No. 11, pp. 404-407; 415-417 of 738).  There was evidence substantiating mild-severe vasospasm on the right and left (Docket No. 11, pp. 407-412; 418-420 of 738).

Results from the CT scan of the brain administered on April 13, 2008, showed no change in the non-hemorrhagic infarct but a slight progression in the size of the ventricles (Docket No. 10, pp. 413-414 of 738).

On April 18, 2008, the transcranial Doppler examination was repeated and the results from the test were compared to a similar examination on April 17, 2008.  The results suggested mild vasospasm (Docket No. 11, pp. 401-403 of 738).

Dr. Rasmussen conducted a post-surgical repair evaluation on May 14, 2008, during which he determined that with the exception of ongoing headaches, Plaintiff was feeling better and that she had some difficulty with memory.  Plaintiff was instructed to return to her PCP for blood pressure control (Docket No. 11, pp. 366-368 of 738).  The results from the Holter report showed a normal sinus rhythm with episodes of sinus arrhythmia (Docket No. 11, p. 443 of 738).

2.      DR. ANJU S. LELE, M.D., AN INTERNIST.

Plaintiff presented on November 8, 2007 to establish a PCP/patient relationship with Dr. Lele.  Dr. Lele planned to regulate Plaintiff's blood pressure with a drug regimen supplemented by diet and exercise (Docket No. 11, pp. 454-455 of 738; www.healthgrades.com/physician/dr-anju-

---

6

Contraction or hypertonia of the muscular coats of the blood vessels.  STEDMAN'S MEDICAL DICTIONARY 432530 (27th ed. 2000).

lele-x3pnx).

During the next visit on November 29, 2007, Dr. Lele increased the dosage of Lopressor and started Plaintiff on Lexapro®, an antidepressant. Dr. Lele noted that Plaintiff had a nagging cough and difficulty breathing and dizziness. Dr. Lele diagnosed Plaintiff with acute asthmatic bronchitis and prescribed a medication approved for use when the infection is strongly suspected to be bacterial in nature (Docket No. 11, pp. 458-461 of 738; PHYSICIAN'S DESK REFERENCE, 2006 WL 368897 (2006)).

A chest X-ray showed normal cardiac silhouette, stable mediastinal and hilar contours and no evidence of focal consolidation, effusion, edema or pneumothorax[7]. There was minimal linear atelectasis or scarring at the left base (Docket No. 11, p. 492 of 738).

On December 5, 2007, Dr. Lele followed up on Plaintiff's cough and shortness of breath. Plaintiff continued to have these symptoms and on December 17, 2007, Dr. Lele suggested that Plaintiff present to the hospital for what was clearly acute bronchitis. Plaintiff continued to have the symptoms and on January 4, 2008, Dr. Lele added Nasacort®, a medication used to treat nasal symptoms, to the drug regimen (Docket No. 11, pp. 462-465 of 738; PHYSICIAN DESK REFERENCE, 2006 WL 388523 (2006)).

Dr. Lele referred Plaintiff for a diagnostic sleep study which was conducted on February 4, 2008. Dr. Tim Kowalski, M. D., determined that based on the sleep study, Plaintiff appeared to have moderate to severe obstructive slow or shallow breathing and obstruction sleep apnea for which he recommended that Plaintiff undergo a continuous positive airway pressure (CPAP) titration (Docket No. 11, pp. 505-507 of 738). On February 15, 2008, Dr. Lele noted that Plaintiff's hypertension was

---

[7] The presence of free air or gas in the pleural cavity. STEDMAN'S MEDICAL DICTIONARY 323250 (27th ed. 2000).

stable (Docket No. 11, pp. 465-468 of 738).  Dr. Kowalski diagnosed Plaintiff with excessive daytime sleepiness after she had undergone the CPAP titration on February 18, 2008 (Docket No. 11, pp. 511-513; 515-516 of 738).

On June 12, 2008, Dr. Lele referred Plaintiff to a neurologist because of the chronic dizziness.  Dr. Lele added Lopressor, a medication used to treat hypertension, to the drug therapy (Docket No. 11, pp. 469-470 of 738; www.drugs.com).  On June 24, 2008, Dr. Lele noted that Plaintiff had a pelvic mass probably a bladder prolapse and her hypertension was better controlled (Docket No. 11, pp. 471-472 of 738).

Plaintiff's cholesterol level was elevated on October 8, 2008.  Dr. Lele started her on Zocor®, a lipid-lowering agent (Docket No. 11, pp. 473-474 of 738; PHYSICIAN'S DESK REFERENCE, 2006 WL 38293 (2006)).

Dr. Lele prescribed an antibiotic and a corticosteroid drug to treat symptoms of sinusitis and bronchitis on November 10, 2008 (Docket No. 11, pp. 475-476 of 738).  On November 17, 2008, Dr. Lele continued the prescription for prednisone and Lopressor (Docket No. 11, pp. 477-478 of 738).

Plaintiff underwent a pulmonary function test on December 10, 2008.  Dr. Lawrence Martin, M.D., determined that overall, the test reflected mild air flow obstruction and decrease in lung volume likely attributable to Plaintiff's obesity (Docket No. 11, pp. 509-510 of 738).

Then on December 18, 2008, Plaintiff was diagnosed with asthma for which Dr. Lele prescribed Advair, a synthetic corticosteroid with potent anti-inflammatory activity and Albuterol, a bronchodilator that relaxes muscles in the airways and increases the air flow to the lungs (Docket No. 11, pp. 479-480 of 738; PHYSICIAN'S DESK REFERENCE, 2006 WL 369194 (2006); and PHYSICIAN'S DESK REFERENCE, 2006 WL 368830 (2006)).

On August 14, 2009, Dr. Lele diagnosed Plaintiff with a ganglion cyst on her arm.  The cyst was benign (Docket No. 11, pp. 481-482 of 738).

On September 24, 2009, Dr. Lele provided prescriptions for medications used to treat and/or control blood pressure and acute bronchitis (Docket No. 11, pp. 495-496 of 738).

On January 8, 2010, Dr. Lele noted that Plaintiff was experiencing night sweats.  Toprol, a beta-blocker used to treat angina and hypertension, was prescribed (Docket No. 11, pp. 488-489 of 738; PHYSICIAN'S DESK REFERENCE, 2006 WL 355270 (2006)).  Dr. Lele continued the Toprol and added Lipitor®, another lipid-lowering agent, to the drug regimen on January 15, 2010 (Docket No. 11, pp. 489-490 of 738; PHYSICIAN'S DESK REFERENCE, 2006 WL 384570 (2006)).

Plaintiff underwent a comprehensive metabolic panel analysis and lipid panel on May 15, 2010.  The amounts of alkaline phosphatase in the blood and cholesterol levels exceeded the set values which health professionals have determined the normal population falls within (Docket No. 11, pp. 660-661; 662-664 of 738).

On May 20, 2010, Dr. Lele continued the Toprol and added Altace, a medication used to lower blood pressure (Docket No. 11 pp. 654-655 of 738; PHYSICIAN'S DESK REFERENCE, 2006 WL 372194 (2006)).

On June 21, 2010, Dr. Lele noted that Plaintiff was still eating "wrong" but better than before.  A diuretic was added to the drug regimen (Docket No. 11, pp. 657-658 of 738).

On January 11, 2011, Dr. Lele reinforced the need to control her blood pressure and restarted her on the appropriate drug regimen.  Dr. Lele noted that Plaintiff was not using her sleep apnea machine and that she refused treatment for anxiety and depression.  Plaintiff was undergoing counseling and she was advised to increase the vitamin D supplements (Docket No. 11, pp. 658-659 of 738).

On July 1, 2011, Dr. Lele advised Plaintiff about the results from her blood work and refilled her medications.  Plaintiff's glucose and cholesterol levels were elevated and she was not watching her diet or exercising.  Neither was she taking her cholesterol medication (Docket No. 11, pp. 695-701 of 738).

### 3.  PATHWAYS, INCORPORATED, A MENTAL HEALTH FACILITY

Plaintiff began by undergoing an adult diagnostic assessment on August 18, 2009, and an initial psychiatric evaluation on August 25, 2009.  Individual counseling subject to psychiatric supervision was ordered (Docket No. 11, pp. 536-550of 764).

On September 8, 2009, it was determined that Plaintiff was tolerating Zoloft well and she was having difficulty sleeping.  Plaintiff declined an offer to add Trazodone, a sleep aid, to her drug regimen (Docket No. 11, pp. 534-535 of 738).

On September 22, 2009, Plaintiff showed slight improvement in her affect and mood but not much.  Plaintiff lacked motivation or the ability to experience pleasure from activities usually found enjoyable.  Plaintiff reported sleeping well and she was attending school (Docket No. 11, pp. 532-533 of 738).

Plaintiff underwent an assessment on September 23, 2009, for individual therapy.  She was referred for therapy to decrease symptoms of depression and to increase coping skills (Docket No. 11, pp. 560-561; 569 of 738).

On October 6, 2009, Plaintiff was tolerating Wellbutrin well.  She had bursts of energy and she noticed slight improvement in motivation (Docket No. 11, pp. 530-531 of 738).  Plaintiff missed her appointment scheduled for October 20, 2009 (Docket No.11, p. 529 of 738).

During individual counseling on October 27, 2009, Plaintiff discussed building a relationship with her counselor (Docket No. 11, p. 570 of 738).  During the first session on November 4, 2009,

Plaintiff discussed her symptoms, triggers and parenting skills. The counselor assisted her with symptom and task management (Docket No. 11, p. 571 of 738).

During the counseling session on November 18, 2009, Plaintiff and her counselor discussed recent symptoms and functioning. Plaintiff reported that she had been able to share social time with friends (Docket No. 11, p. 572 of 738).

On December 2, 2009, the counselor noted that Plaintiff had a low, but stable mood. She had discovered that a respite from her children positively affected her mood (Docket No. 11, p. 573 of 738).

Plaintiff was tolerating Wellbutrin but it only helped "a little" (Docket No. 11, pp. 527-528 of 738). By December 10, 2009, Plaintiff showed slight improvement while taking Effexor. Her lack of motivation continued to be pervasive (Docket No. 11, pp. 523-525 of 738).

During her counseling session on December 29, 2009, Plaintiff explained that she had some improved symptoms and that she was functioning with some mood improvement (Docket No. 11, p. 574 of 738).

Plaintiff was doing better and the counselor reported significant improvement on January 7, 2010. Her ability to sleep was still in flux (Docket No. 11, pp. 521-522 of 738).

During an individual counseling session on January 20, 2010, Plaintiff was in a low and anxious mood because she had no food in the house and she lost her food stamps. Plaintiff's counselor assisted her in making contact with community resources that assist with providing basic human needs (Docket No. 11, p. 575 of 738).

During her January 26, 2010 counseling session, Plaintiff shared that she continued to feel down and unmotivated. She explored options for controlling her children's behaviors (Docket No. 11, p. 576 of 738).

14

On February 9, 2010, Plaintiff reported to her counselor that she continued to work on her coping skills.  Although she was sleeping less, Plaintiff still needed assistance with being motivated to do anything.  She was in a stable mood (Docket No. 11, p. 577 of 738).

During the February 23, 2010 counseling session, Plaintiff invested well in the process, drawing correlations between her son's behaviors and reactions to the abuse she suffered at the hands of her husband (Docket No. 11, p. 578 of 738).

On March 9, 2010, Plaintiff was doing "pretty well" and sleeping well (Docket No. 11, pp. 519-520 of 738).  During an individual counseling session on the same date, Plaintiff expressed concern that her mood was low and she was feeling more hopeless because she lost a part of her support system (Docket No. 11, p. 580 of 738).

During group therapy on March 10, 2010, Plaintiff actively participated during the various activities and discussions (Docket No. 11, p. 582 of 738).  At the group therapy session on March 11, 2010, Plaintiff was hopeful that things would improve.  Group members  shared circumstances and situations in which they practiced coping skills (Docket No. 11, p. 583  of 738).  During group therapy on March 16, 2010, March 17, 2010 and March 18, 2010, Plaintiff participated in group activities designed to facilitate open communication and use of coping skills (Docket No. 11, pp. 584; 585; 586 of 738).  In particular on March 18, 2010, Plaintiff underwent individual counseling, during which she expressed angst over "really bad" family issues (Docket No. 11, p. 587 of 738).

When she resumed group therapy on March 23, 2010, Plaintiff worked on coping skills and the skill of participation (Docket No. 11, p. 588 of 738).  At individual counseling on the same date, Plaintiff shared stressors regarding her son's behavior and her preparation for a Section 8 inspection on the following day (Docket No. 11, p. 589 of 738).

During group therapy on March 24, 2010, March 25, 2010 and April 1, 2010, Plaintiff's mood was relieved and her affect was more positive (Docket No. 11, pp. 590; 591; 596 of 768). On March 30, 2010 and March 31, 2010, Plaintiff's mood was optimistic and her affect was consistent with her mood (Docket No. 11, pp. 593; 595 of 738). In fact, during individual counseling, Plaintiff shared that she was doing better because her inspection went well and the case pending with family services was being closed (Docket No. 11, p. 594 of 768).

On March 25, 2010, Plaintiff was directed to identify her personal contributions to her problems. At that point, the counselor opined that Plaintiff was markedly impaired in her ability to control intrusive thoughts about her problems and applying coping mechanisms. Plaintiff was described as a person with self doubt and confusion that was likely to cause ongoing interference with appropriate problem solving and decision making abilities (Docket No. 11, 557-559 of 738).

During individual and group therapies conducted on April 6, 2010, Plaintiff was in a happy mood and her affect was consistent with her mood (Docket No. 11, pp. 597-598 of 738). On April 7, 2010, Plaintiff practiced mindfulness during group therapy (Docket No. 11, p. 599 of 738). On April 8, 2010, Plaintiff was motivated to "get back to her old self" (Docket No. 11, p. 600 of 738). On April 13, 2010, Plaintiff was content, her affect was consistent with her mood and her sleep and appetite were within a range considered normal for Plaintiff. Her energy level and her desire to do things were reportedly low (Docket No. 11, p. 601 of 738). On April 14, 2010, Plaintiff's mood was aggravated as she was having difficulty with her daughter's oppositional behaviors (Docket No. 11, p. 602 of 738). On April 15, 2010, Plaintiff reported that "things are starting to look up" (Docket No. 11, p. 603 of 738).

Thereafter, Plaintiff continued counseling for over a year supplemented by drug therapy. She

16

generally espoused a positive mood and her affect was consistent with her mood.  Plaintiff became

an active participant in the group sessions, learning how to facilitate behavioral shaping, identify

the negative, balance stress and become resilient (Docket No. 11, pp. 606-612 of 738).

On May 18, 2010, Plaintiff expressed frustration as she was not accomplishing her goals.

She actively participated in a skill building exercise designed to shatter the barriers to mindfulness

(Docket No. 11, p. 612 of 738).

From May 19, 2010 through May 26, 2010, Plaintiff actively participated in group therapy

and she reported situations where she practiced her coping skills and she participated in exercises

which ideally lead to tolerance and improvement (Docket No. 11, pp. 613-615 of 738).

### 4. DR. DIANE E. SMITH, DOCTOR OF OSTEOPATHIC MEDICINE (DOCKET NO. 11, p.735 of 738).

On June 22, 2010, Dr. Smith diagnosed Plaintiff with a major depressive disorder (MDD)

and described the following physical problems that could be relevant to diagnosing and treating

Plaintiff's mental disorders:

- Ruptured aneurysm.
- Hypertension.
- Vitamin D deficiency.
- Pre-diabetes.

Dr. Smith conducted counseling including sleep hygiene and treatment options.  When attributing

a numeric score to rate subjectively Plaintiff's social, occupational and psychological functioning,

Dr. Smith attributed a global assessment of functioning[8] score that evidenced serious symptoms (ex:

suicidal ideation, severe obsessive rituals) or any serious impairment in social, occupational, or

---

[8]

This numeric scale is used by mental health clinicians and physicians to rate, subjectively, the psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  www.medical-dictionary.thefreedictionary.com/global+assessment+ of+functioning).

school functioning (ex: no friends, unable to hold a job) (Docket No. 11, pp. 619-621 of 738).

Plaintiff advised Dr. Smith on August 26, 2010, that she was doing well with taking Zoloft (Docket No. 11, pp. 720-721 of 738).

On October 8, 2010 and December 30, 2010, Dr. Smith reviewed the working diagnosis and treatment options, reinforced the need to comply with the medication regimen and make healthy choices (Docket No. 11, pp. 717; 718-719 of 738).

Dr. Smith conducted 30-minute medication management sessions on January 27, 2011, February 14, 2011, April 22, 2011, May 20, 2011, August 2, 2011, September 27, 2011, October 27, 2011 and December 8, 2011.  Generally, Plaintiff denied hallucinations, her cognition was baseline; her mood was better; her affect was congruent with her mood; and her insight judgment was best described as "fair."  Dr. Smith noted that Plaintiff's appetite was stable and she was averaging up to seven hours of broken sleep.  During each visit, Dr. Smith reiterated that there were side effects of her medication but she strongly encouraged Plaintiff to comply with her medication regimen. Notably, during the September 27-visit, Dr. Smith added Abilify to the regimen (Docket No. 11, pp. 706-707; 708-709; 710-711; 712-713; 715-716; 728-729 of 738).

On May 20, 2011, Dr. Smith completed the DAILY ACTIVITIES QUESTIONNAIRE, suggesting that Plaintiff had poor stress tolerance, poor focus, loss of interest and motivation, poor pace and poor memory (Docket No. 11, pp. 682-683 of 738).

Plaintiff was last seen on December 8, 2011 and she presented to Dr. Smith on February 9, 2012, representing that she was under a lot of stress and extremely frustrated.  Dr. Smith described her mood as stressed and her affect was "somewhat flat."  Plaintiff displayed psychomotor agitation by mild rocking and she had poor-to-adequate hygiene.  Dr. Smith reinforced the need to take her

medication and she reiterated the basics of sleep hygiene (Docket No. 11, pp. 730-731 of 738).

Dr. Smith completed an ASSESSMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (MENTAL) on February 9, 2012, finding that:

(1)  Plaintiff had marked limitations in the ability to:

- Maintain concentration and attention for extended periods.
- Understand, carry out and remember instructions.
- Respond to customary work pressures.
- Respond appropriately to changes in the work setting.

(2)  Plaintiff had moderate limitations in the ability to:

- Relate to other people.
- Engage in daily activities.
- Maintain her personal hygiene.
- Sustain a routine without special supervision.
- Perform complex, repetitive or varied tasks.
- Behave in an emotionally stable manner.

(3)  Plaintiff had mild limitations in her ability to:

- Perform activities within a schedule, maintain regular attendance and be punctual.
- Perform simple tasks.

Dr. Smith concluded that Plaintiff had made significant improvement with medication but not to the point that she would be able to function in an employment situation for several reasons:

- Plaintiff's symptoms were "abusive."
- Plaintiff was unable to remember dates and times.
- Plaintiff's depression was severe and exacerbated by the brain aneurysm.
- Plaintiff's condition deteriorated if placed under stress.
- Plaintiff would likely be absent from work more than three times monthly (Docket No. 11, pp. 178-179; 733-734 of 738).

Plaintiff presented to Dr. Smith on April 5, 2012, expressing frustration as she was without a car; however, she did not have any side effects from her medication.  Plaintiff denied any hallucinations, her appetite was stable, her sleep was "okay," no delusions were apparent and her affect was congruent with her mood.  Dr. Smith reaffirmed her initial diagnoses:  MDD, ruptured

aneurysm, hypertension, vitamin D deficiency and pre-diabetes.  Plaintiff's global assessment of functioning on that date was indicative of serious symptoms (ex: suicidal ideation, severe obsessive rituals) or any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job).  The medication regimen was continued (Docket No. 11, pp. 737-738 of 738).

5. **MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT (MRFC); PSYCHIATRIC REVIEW TECHNIQUE (PRT); AND PHYSICAL RESIDUAL FUNCTIONAL CAPACITY (PRFC).**

Dr. B. Goldsmith, Ph.D., a psychologist, completed the MRFC and PRT forms on September 3, 2010.  The MRFC analysis covers a period from February 19, 2009 through September 3, 2010 and the PRT incorporates the period of July 4, 2008 through September 3, 2010.  In the MRFC, Dr. Goldsmith found that there was no evidence of marked impairments but there was evidence of moderate limitations in the ability to:

- Carry out detailed instructions.
- Maintain attention and concentration for extended periods.
- Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
- Interact appropriately with the general public.
- Except instructions and respond appropriately to criticism from supervisors.
- Respond appropriately to changes in the work setting (Docket No. 11, pp. 625-627 of 738).

In the PRT, Dr. Goldsmith opined that Plaintiff had a medically determinable impairment, namely, a depressive disorder, not otherwise specified, and that the degree of functional limitations that existed as a result of the depressive disorder is as follows:

- Restriction of Activities of Daily Living            Mild
- Difficulties in Maintaining Social Functioning           Moderate
- Difficulties in Maintaining Concentration, Persistence of Pace     Moderate
- Episodes of Decompensation, Each of Extended Duration        None

There was no evidence of the "C" criteria.  In other words, there was no impairment related functional limitations that were incompatible with the ability to do gainful activity (Docket No. 11,

20

pp. 630-642 of 738).

Dr. Carl G. Leigh, M.D., completed a PRFC assessment on September 7, 2010, considering the primary diagnosis of hypertension and secondary diagnoses of obesity and sleep apnea.  He opined that the severity of Plaintiff's functional limitations noted in the RFC assessment was more consistent with the evidence in the file rather than Plaintiff's allegations.  Dr. Leigh opined that Plaintiff had no communicative, environmental or visual limitations.  Her exertional limitations were subject to the following restrictions:

- Occasionally lifting and/or carrying fifty pounds.
- Frequently lifting and/or carrying twenty-five pounds.
- Standing and/or walking about six hours in an eight-hour workday.
- Sitting with normal breaks for a total of about six hours in an eight-hour workday.
- Pushing and/or pulling on an unlimited basis.
- Occasionally climbing using a ramp/stairs/ladder/rope/scaffold and crawl.
- Frequently balancing, stooping, kneeling or crouching (Docket No. 11, pp. 644-649 of 738).

### 6.  DAILY ACTIVITIES QUESTIONNAIRE.

With the assistance of Signature Health personnel, Plaintiff completed a form provided by the Bureau of Disability Determination on March 25, 2011, in which she described how she lived, defined her personal and familial relationships and described her ability to care for her needs. Plaintiff admitted that she visited family and friends up to four times annually and that she struggled to maintain a home for her children (Docket No. 11, pp. 665-666 of 738).

### 6.  DR. MARGARET ZERBA, PH. D., PSYCHOLOGIST.

On May 5, 2011, Plaintiff gave an overview of her family, health, work and family history. Dr. Zerba observed that Plaintiff's grooming and hygiene were good, that she was slow and fairly well organized and coherent.  Plaintiff appeared depressed with a flat affect.  Plaintiff reported no history of panic attacks or problems with anxiety.  Dr. Zerba diagnosed Plaintiff with a depressive disorder and attributed a global assessment of functioning score that denoted serious symptoms (ex:

21

suicidal ideation, severe obsessive rituals) or any serious impairment in social, occupational, or

school functioning (ex: no friends, unable to hold a job)

With respect to functional limitations, Dr. Zerba opined that:

- Plaintiff was able to follow instructions and directions
- Plaintiff's depression will adversely affect her ability to maintain attention, concentration, persistence and pace to complete simple and multi-step tasks.
- Plaintiff's depression, mood changes and inactivity will make it difficult for her to manage relationships on the job.
- Plaintiff's depression, mood changes and inactivity will affect her ability to manage work pressures (Docket No. 11, pp. 670-675 of 738).

**7. MANUAL MUSCLE TESTING.**

Dr. Dorothy A. Bradford, M. D., conducted such testing on June 21, 2011 and determined

that Plaintiff could raise her shoulders, elbows, wrists, fingers, hips, knees, feet and toes against

maximal resistance; that her grasp and ability to manipulate were within normal limits; that the range

of motion in her cervical spine, shoulders, elbows, wrists, hands-fingers, dorsolumbar spine, hips,

knees and ankles was normal. Dr. Bradford concluded that Plaintiff's two cerebral aneurysms were

successfully treated and that her hypertension and depression were well controlled (Docket No. 11,

pp. 685-691 of 738).

**VI. THE LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS**

The Commissioner's regulations governing the evaluation of disability for DIB are found

at 20 C. F. R. § 404.1520. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). DIB is available

only for those who have a "disability." *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R.

§ 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.

22

F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires.  *Key v. Callahan*, 109 F. 2d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*  Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*  For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VII. THE ALJ'S FINDINGS.

After careful consideration of the legal framework for establishing disability, the medical

evidence and the entire record, the ALJ made the following findings of fact and conclusions of law:

1. At step one, Plaintiff met the insured status requirements of the Act through March 31, 2013.  She had not engaged in substantial gainful activity since September 9, 2010, the commencement date of her unadjudicated period.

2. At step two, Plaintiff had severe impairments, namely: (1) morbid obesity, (2) status post surgical clipping of brain aneurysms, (3) hypertension and (4) depression.

3. At step three, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Moreover, Plaintiff had the residual functional capacity to perform less than a full range of light work and she could:

   a.  occasionally balance, stoop, kneel, crouch, crawl, and climb stairs;
   b.  never climb using ladders, ropes or scaffolds;
   c.  perform simple, routine tasks without strict production quotas, more than minimal changes in work duties; and
   d.  have no more than superficial interpersonal interactions with others.

4. At step four, Plaintiff was unable to perform any past relevant work.

5. At step five, Plaintiff was 43 years of age on the day her disability began which is defined as a younger individual; Plaintiff had at least a high school education and she was able to communicate in English.  Considering her age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

6. Plaintiff has not been under a disability, as defined in the Act, from April 30, 2008 through the date of this decision or May 14, 2012 (Docket No. 11, pp. 16-24 of 738).

## VIII. STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*.  *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011).  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings.  *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir.

2005)).  "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).

The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence.  *Id*. at 740-741.  To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).  Further, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence on record.  *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)).  In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact.  *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers.  *Id.*  It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)).  Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)).  However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

### IX. PLAINTIFF'S ARGUMENTS.

Plaintiff seeks remand because:

1.      The ALJ failed to consider Dr. Smith a treating source and attribute controlling weight to her opinions.
2.      Alternately, the ALJ failed to explain why such opinions were not entitled to controlling weight.
3.      The ALJ's credibility determination is not based on substantial evidence.

## X. DEFENDANT'S RESPONSE.

1.  The ALJ's decision to give less than controlling weight to the opinions of Dr. Smith is supported by substantial evidence.
2.  Plaintiff's testimony was not fully credible.

## XI. ANALYSIS.

### 1. THE TREATING SOURCE.

Plaintiff suggests that the ALJ identified Dr. Smith as a treating source but failed to give her opinions controlling weight or explain why her opinions were discounted.

#### A. THE TREATING SOURCE RULE

It is well established that the Commissioner has elected to impose certain standards on the treatment of medical source evidence. *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011) (*citing* 20 C.F.R. § 404.1502). Under the treating physician rule, the Commissioner has mandated that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). If the ALJ declines to give a treating source's opinion controlling weight, he or she must then balance the following factors to determine what weight to give it, specifically, the "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and

26

specialization of the treating source." *Id.* (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6ᵗʰ Cir.2004) (*citing* 20 C.F.R. § 404.1527(d)(2)).  Furthermore, the Commissioner imposes on its decision makers a clear duty to "always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion." *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (*citing* TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, SSR 96-2p, 1996 WL 374188, \*1 (1996)).

### B. APPLICATION OF THE RULE.

The Magistrate finds that Plaintiff's first and second arguments have merit.  The ALJ clearly identified Dr. Smith as a treating physician based on the evidence that shows she treated Plaintiff over a period of time that spanned two years.  Dr. Smith had a deeper insight into Plaintiff's medical condition after having treated her practically every month in 2011 (Docket No. 11, pp. 706-707; 708-709; 710-711; 712-713; 715-716; 728-729 of 738).  The ALJ was obligated by regulation to undertake a specific analytical protocol and explain the weight accorded such evidence and give good reasons why he was giving less than controlling weight to Dr. Smith's opinions.  The Magistrate finds no discernable weight assignment in the ALJ's claim that he discounted Dr. Smith's opinions in the same manner as he discounted the opinions of the consultative examiner (Docket No. 11, p. 21 of 738).  There is a modicum of reasoning that is relevant to why he attributed "some" weight to the opinion of the consultative examiner; however, no such specific reasons are given to justify giving those opinions "some" weight or what "some" weight is.  The ALJ's decision  fails

to provide a basis for determining  what "some" weight means.

The Magistrate is foreclosed from conducting meaningful judicial review by ALJ's failure to comply with the treating physician rule.  Thus, the ALJ's decision was made according to an erroneous legal standard.  This case is remanded to the ALJ, pursuant to sentence four of 42 U.S.C. § 405(g), for consideration of Plaintiff's claim in light of full review of the treating physician evidence and analysis.

## 2.  CREDIBILITY.

Plaintiff contends that the ALJ improperly discounted her credibility.  Specifically, the ALJ relied on cryptic comments from Dr. Lele about her failure to comply with the medication regimen with full knowledge that Plaintiff has severe, documented psychological difficulties.  Furthermore, the ALJ failed to cite substantial evidence justifying having not accepted Plaintiff as credible

### 1.  THE CREDIBILITY STANDARD OF REVIEW.

The Commissioner and his examiner, as the fact-finders, are authorized to pass upon the credibility of the witnesses and weigh and evaluate their testimony.  *Lucas v. Astrue,*  2013 WL 1150026, *10 (N.D.Ohio,2013) *report adopted by* 2013 WL 1150019 (N.D.Ohio 2013) (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir.2001), *quoting Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir.1972)).  If a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, then the ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in SSR 96–7p.  *Id.* (*See* TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96–7p, 1996 WL 374186, *1 (1996); 61 Fed. Reg. 34483, 34484–34485 (1990)).  These factors include:

28

(1)      the claimant's daily activities;
(2)      the location, duration, frequency and intensity of the pain;
(3)      precipitating and aggravating factors;
(4)      the type, dosage, effectiveness and side effects of any pain medication;
(5)      any treatment, other than medication, that the claimant receives or has received to relieve the pain; and
(6)      the opinions and statements of the claimant's doctors.

*Id.* (*citing Felisky v. Bowen*, 35 F.3d 1027, 1039–40 (6th Cir. 1994).

An ALJ's "findings based on the credibility of the applicant are to be accorded great weight and deference." *Winning v. Commissioner of Social Security,* 661 F.Supp.2d 807, 822 (N.D.Ohio,2009) (*citing Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir.1997)). Such findings must, however, be supported by substantial evidence. *Id.* A claimant's credibility may be discounted, "to a certain degree," where an ALJ "finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.* Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.* at 823 (*citing Rogers v. Commissioner*, 486 F.3d 234, 248 (6th Cir. 2007)).

The ALJ is not permitted to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Id.* at 822-823 (*citing Rogers, supra*; SSR 96–7p: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS)). SSR 96–7p states that the ALJ's decision must contain specific reasons for the credibility determination and "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *3.

### 2.  THE CREDIBILITY FINDING IN THIS CASE.

Plaintiff's disability could not be made solely on the basis of the objective medical evidence;

29

accordingly, the ALJ was required to analyze Plaintiff's credibility.  Although the ALJ cited to SSR 96-7p and acknowledges that he must make a credibility determination based on the record, the ALJ refers to his credibility analysis in one sentence, noting that he considered it in the residual functional capacity assessment (Docket No. 11, p. 20 of 738).  The ALJ failed to explain what he considered in assessing credibility and on what the analysis is based.  In the alternative, the ALJ failed to sufficiently explain the rationale for his credibility determination.

The Magistrate cannot perform a meaningful review of the ALJ's credibility determination.  Therefore,  remand is necessary for the ALJ to properly assess the credibility and provide reasons for his credibility determination that are sufficiently specific to make clear what the credibility finding actually is, the evidence on which it is based and the reasons for his finding as specified in SSR 96-7p.

## XII. CONCLUSION

For the reasons set forth above, the undersigned Magistrate Judge recommends that this Court:  (1) remand the case to the Commissioner with instructions to conduct an analysis of Dr. Smith's reports and opinions consistent with the treating physician rule; make a credibility determination consistent with the rules; and reexamine whether Plaintiff is disabled once the rules have been appropriately applied and all of the evidence considered; and (2) terminate the referral to the undersigned Magistrate Judge.


/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  January 13, 2014

### XIII.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.

31